**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LAMAR TYREE MONROE,

               Petitioner,

v.                                     Case No. 3:21-cv-683-TJC-SJH

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

               Respondents.

_____

**ORDER**

**I.      Status**

      Petitioner, an inmate of the Florida penal system, is proceeding on an Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Doc. 4). Petitioner challenges a state court (Duval County, Florida) judgment of conviction for armed robbery for which he is serving a mandatory life sentence. See Doc. 4 at 1. Respondents filed a Response (Doc. 15) with exhibits (Docs. 15-1 to 15-24; Ex.).[1] Petitioner filed a Reply (Doc. 16). This case is ripe for review.[2]

---

[1] Respondents filed the Response and exhibits twice (Docs. 15, 16). When citing to the exhibits throughout this Order, the Court will use the page numbers added by Respondents.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th

II.    <u>**Governing Legal Principles**</u>

**A. Standard Under § 2254**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016) (explaining AEDPA deference), <u>abrogation in part on other grounds recognized by</u> <u>Smith v. Comm'r, Ala. Dep't of Corr.</u>, 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>Harrington v. Richter</u>, 562 U.S. 86,

---

Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes

3

federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified) (emphasis in original).

## B. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable,

4

professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v.

5

<u>Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105).

### III.   <u>Procedural History</u>

By amended information filed on October 8, 2010, the State of Florida charged Petitioner with armed robbery (Count 1) and possession of a firearm by a convicted felon (Count 2). Ex. 2. Petitioner proceeded to trial on October 15, 2010, solely on the armed robbery charge. Ex. 6 at 1, 65.[3] The jury returned a guilty verdict, finding Petitioner robbed the two victims identified in the amended information and "actual[ly] possessed a firearm during the commission of the offense." Ex. 7 at 203. The trial court sentenced Petitioner to a term of life with no possibility of parole. Ex. 8 at 4.

With the help of appellate counsel, Petitioner filed a direct appeal in Florida's First District Court of Appeal, arguing solely that the trial court erred

---

[3] According to Petitioner's brief on direct appeal, the trial court granted his pretrial motion to sever the counts for trial, and the State dismissed Count 2 after trial. Ex. 9 at 5.

in denying his motion to suppress the victims' out-of-court and in-court identifications of him. Ex. 9 at 2. He subsequently filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Exs. 12, 13. After conducting an evidentiary hearing, the postconviction court denied Petitioner's motion. Exs. 14, 16. The First DCA per curiam affirmed without a written opinion. Ex. 24. In his Amended Petition before this Court, Petitioner raises four grounds—three alleging ineffective assistance of trial counsel and one alleging trial court error. Doc. 4 at 5-10.

### IV.   <u>Analysis</u>

#### A. Ground One

Petitioner argues his trial counsel was ineffective for failing to investigate and call four alibi witnesses after telling the jury in his opening statement that the defense would offer alibi testimony. <u>Id.</u> at 5. According to Petitioner, "it was objectively unreasonable for [his counsel] to decide before trial to present the alibi defense/witnesses, make that promise to the jury in opening, and then later abandon that strategy" without adequately investigating what the witnesses' testimony would have been. Doc. 19 at 7.

Petitioner exhausted this claim, having raised it in his Rule 3.850 motion. Ex. 13 at 7. After hearing evidence, including testimony from Petitioner's trial counsel and Petitioner, the postconviction court denied the claim. Exs. 15, 16. In doing so, the postconviction court set forth the two-prong <u>Strickland</u>

standard and concluded counsel's decision not to call alibi witnesses was a reasonable strategic one based on the evidence:

> Reasonable strategic or tactical decisions by counsel do not constitute ineffective assistance. See Mosley v. State, 209 So. 3d 1248, 1268 (Fla. 2016) (quoting Peterson v. State, 154 So. 3d 275, 280 (Fla. 2014) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."); Bradley v. State, 33 So. 3d 664, 671 (Fla. 2010); Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000); Thompson v. State, 174 So. 3d 453, 456 (Fla. 1st DCA 2015).

> [Petitioner] is correct that in his opening statement, counsel did tell the jury he would present witnesses who would testify they were with [him] from approximately 6 p.m. to 1:30 or 2:30 a.m. on the night of the robbery, but during trial presented no alibi witnesses. However, at the evidentiary hearing, counsel testified he had made a strategic decision as the trial progressed to not call the above-listed witnesses. He explained he was concerned about presenting the alibi witnesses because of the numerous discrepancies in their accounts of the day in question. Further, the State presented text messages exchanged between [Petitioner] and his girlfriend that contradicted the story that [Petitioner] was with his family all day. Tameka Monroe also initially stated to the State Attorney [that Petitioner] was not with the family the entire day. Counsel felt presenting the alibi witnesses would have been damaging to the defense in light of this evidence. Weighing these considerations, counsel felt the stronger defense was to attack the identification of [Petitioner] as the perpetrator, rather than pursue an alibi defense.

> At the evidentiary hearing, [Petitioner] testified counsel did not discuss with him the decision not to call

his alibi witnesses. Although [counsel] could not recall a specific conversation with [Petitioner] about this strategic choice, counsel testified it is his standard practice to discuss such decisions with his clients, and he would have done so with [Petitioner].

The Court finds counsel's strategy to not call Elaine Monroe, Tameka Monroe, Ebony Monroe, or Jasmine Mixson as alibi witnesses, reasonable. See Bradley, 33 So. 3d at 671; Occhicone, 768 So. 2d at 1048; Thompson, 174 So. 3d at 456. Further, although counsel's memory of some details of this case has faded with time, his testimony of his habit and routine "creates an inference which can be considered by the trier of fact without corroborative evidence." State v. Avila, 43 So. 3d 936, 938 (Fla. 3d DCA 2010). Thus, the Court also finds counsel's testimony that his standard practice is to discuss strategic decisions with his clients more credible than [Petitioner's] testimony that such discussion did not occur in this case. See Bussell, 66 So. 3d at 1062; Thomas, 838 So. 2d at 540-41.

Ex. 16 at 2-3, 4-5 (internal record citations omitted). Petitioner appealed the denial of his Rule 3.850 motion, and the First DCA per curiam affirmed without a written opinion. Ex. 24.

In accordance with the deferential standard for federal court review of state court adjudications, the Court finds the record amply supports the state court's adjudication of this claim. Petitioner's trial counsel explained at the evidentiary hearing that he investigated Petitioner's purported alibi defense and reviewed each witness's sworn statement, noting "a number of discrepancies" and contradictions:

> There was [sic] discrepancies among all the witnesses. Again, I believe that [Petitioner's sister] said she never left the apartment . . . all day, whereas the others said that they did. They went out and got Little Caesar's Pizza or Domino's Pizza. And then . . . some of witnesses said they went to Blockbuster's to get movies whereas [Petitioner's mother] said they went over to one of his sister's house [sic] to get a DVD player and movies from her house. But most importantly . . . I was concerned that all of these witnesses saying that [Petitioner] was with them all day when there was evidence to show that he was not would make it seem like the whole alibi was concocted to get away with something, whereas I thought the ID in the case was extremely poor.

Doc. 14 at 83, 91. Petitioner conceded at the evidentiary hearing that there were some discrepancies in his alibi witnesses' accounts of the evening but said that "people . . . remember [events] in different ways." Id. at 73.

Petitioner's trial counsel testified that whether to call the alibi witnesses was "a game day decision" because he wanted to "see how the trial went." Id. at 95. He could not recall any specific conversations he had with Petitioner after the trial started about whether to call the witnesses but said that "[Petitioner] would have . . . participated in [the] decision." Id. at 126. Counsel explained that, during trial, the State introduced text messages directly contradicting the alibi witnesses' stories that Petitioner was with them all day and could not have gone anywhere on his own because he had no car or license. Id. at 83-84. Text messages between Petitioner and his girlfriend on the night of the robbery suggested Petitioner had borrowed his girlfriend's car and was driving it at 8:44

p.m. Id. at 93-94; Ex. 15 at 5. The robbery occurred between 9:45 and 11:00 p.m. Ex. 6 at 93, 111, 139.

Petitioner points to no Supreme Court or Eleventh Circuit precedent holding that an attorney is constitutionally ineffective when he ultimately does not present evidence he tells the jury in opening statement to expect from the defense. See Doc. 4 at 5; Doc. 19 at 13-14. However, even if counsel was deficient in not fulfilling a promise he made to the jury in his opening statement, Petitioner fails to show that but for trial counsel's alleged error, the outcome of his trial would have been different.

Both victims positively and confidently identified Petitioner as the assailant at trial. Ex. 6 at 97, 125. Additionally, two days after the robbery, the female victim positively identified Petitioner through a photospread. Id. at 108, 182. She testified that when she turned over the photo of Petitioner, she nearly passed out and started crying and shaking. Id. at 108. She said that she became so upset that her "signature looked like scribble," and she "could barely speak to the detective." Id. The detective who arranged and conducted the photospread confirmed at trial that the victim became "visibly upset" when she flipped over the photo of Petitioner, which was the fourth of six photos. Id. at 182. The male victim was unable to positively identify Petitioner through the photospread, but he narrowed the six photos to two, one of which was of Petitioner. Id. at 127, 184.

After conducting the photospread, the detective obtained an arrest warrant. Id. at 185. The arresting officer testified that he found Petitioner inside an apartment "in the corner [of a toddler's bedroom] crouched down [beside] a bureau or dresser drawers." Id. at 167, 171. Following arrest, Petitioner was brought to the Police Memorial Building (PMB) where he freely and voluntarily waived his Miranda rights and submitted to an interview. Id. at 190-91. The video of the interview was played for the jury. Id. at 198. During that interview, a detective told Petitioner he was being questioned in connection with an "armed robbery" without mentioning the specific weapon involved, yet Petitioner "mentioned that a pistol had been used" and disclaimed having owned such a gun. Id. at 191-92; Ex. 7 at 16.[4] Petitioner also suggested he knew which Walgreens location was involved before the detective disclosed that information to him. Ex. 6 at 194; Ex. 7 at 6. Based on Petitioner's voluntary, spontaneous statements about the involvement of a gun and the location of the

---

[4] When the detective asked Petitioner how he knew a gun was involved, Petitioner suggested that the officer who arrested him may have mentioned it. Ex. 7 at 16. On cross-examination, the detective admitted that he did not know whether the arresting officer told Petitioner he was being arrested for "robbing . . . people at gunpoint." Id. at 52, 66. However, there was no direct evidence that Petitioner learned prior to the interview at the PMB that the robbery involved a gun. The arresting officer testified that he does not "interview" suspects when executing arrest warrants, and "[t]here is no need" to "give details of the case to a [suspect during] arrest[]." Ex. 6 at 168. The officer also testified that he did not recall giving any details about the robbery to Petitioner in this case. Id.

Walgreens, the detective concluded that Petitioner must have "had knowledge of the incident." Ex. 6 at 192-93, 195.

Finally, the State and defense stipulated to the admission of jail calls between Petitioner and his girlfriend from whom it was alleged he borrowed a car on the night of the robbery. Ex. 7 at 68-69. Although most of the conversation is difficult to understand and vague,[5] Petitioner said he had just learned the State obtained his text history and therefore knew that he had driven his girlfriend's car on the night of the robbery, contradicting what he told the detectives when interviewed post-arrest—that he never left his mom's apartment. Id. at 71. Petitioner said the text messages "fu**ed" his case. Id. At first, he told his girlfriend he wanted her to testify at trial that he "did not have [her] . . . car" that day. Id. at 72. He then told her the story would be that he did have her car that day, but he did not use it to "rid[e] around" town but rather to help his mother move, after which he fell asleep and returned to his girlfriend's house at about 2:30 a.m. Id. at 74-75, 77-78. His girlfriend said, "Lamar, I'll do whatever I got to do, but you know (inaudible) play a dirty game." Id. at 72.

Upon thorough review of the record and the applicable law, the Court finds that the state court's denial of Petitioner's claim was neither contrary to

---

[5] Petitioner knew jail calls were monitored, and he told his girlfriend he was going to call her back using another inmate's "pin." Ex. 7 at 69.

nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented. <u>See</u> 28 U.S.C. § 2254(d). Ground One is denied.

### B. Ground Two

Petitioner argues his trial counsel was ineffective for failing to request an alibi jury instruction. Doc. 4 at 7. He raised this claim in his Rule 3.850 motion, Ex. 13 at 13-14, which the postconviction court denied under the <u>Strickland</u> standard on the following grounds:

> A trial court must instruct the jury on the law applicable to an alibi defense if there was evidence to support such an instruction. <u>See</u> <u>Pasha v. State</u>, 225 So. 3d 688, 711 (Fla. 2017); <u>Milton v. State</u>, 192 So. 219, 222 (1939) (finding evidence incomplete and insufficient to support an alibi instruction). Here, the only alibi evidence was [Petitioner's] mother's lease form showing the date of [the robbery], and [Petitioner's] self-serving statements made during a police interview that he was helping his mother move all day and stayed with her into the night when the crime occurred. Otherwise, counsel did not present an alibi defense. Because insufficient evidence was presented to support an alibi instruction, a request by counsel for same would have been meritless. "Trial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding." <u>Teffeteller</u>, 734 So. 2d at 1023.
>
> Further, the Court finds [Petitioner] cannot show prejudice resulting from this alleged deficiency. The Court instructed the jury using Florida Standard Criminal Jury Instruction 3.7, which provides in part: "To overcome the defendant's presumption of

14

innocence, the State has the burden of proving the crime with which the defendant is charged was committed and **the defendant is the person who committed the crime."** Thus, even without an alibi instruction, the jury was instructed it had to find beyond a reasonable doubt [Petitioner] was the person who committed the crime in order to return a guilty verdict. When the jury instructions are viewed as a whole, the absence of the alibi instruction did not result in prejudice such that the Court's confidence in the verdict is undermined. See <u>Strickland</u>, 466 U.S. at 694.[6]

Ex. 16 at 6-7 (internal record citations omitted) (emphasis in original). Petitioner appealed the denial of his Rule 3.850 motion, and the First DCA per curiam affirmed without a written opinion. Ex. 24.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Two is denied.

**C. Ground Three**

Petitioner argues his trial counsel was ineffective for advising him not to testify because the jury would hear the nature of his prior conviction if he had,

---

[6] In addition, for the reasons stated in Ground One, Petitioner did not pursue an alibi defense at trial.

and for assuring him the case was "in the bag." Doc. 4 at 8. Petitioner raised

this claim in his Rule 3.850 motion, Ex. 13 at 15, which the postconviction court

denied, finding Petitioner's counsel's testimony at the evidentiary hearing more

credible than his own:

> At the evidentiary hearing, [Petitioner] testified that at some point prior to trial, counsel advised him that if he were to testify at trial, the jury would learn the nature of his prior convictions. [Petitioner] also stated that during trial, after the Court's colloquy, counsel did not discuss with him his decision to testify, but instead called another witness and then rested the case without further consultation with [him].

> Conversely, counsel testified that although he could not recall the exact details of their discussion, he would have told [Petitioner] if he chose to testify, the jury would learn only that he had a prior conviction. Counsel testified he would not have advised [Petitioner] that the jury would learn the nature of his prior conviction. Counsel did not recall telling [Petitioner] his case was "in the bag" and stated in his routine practice, he would never tell that to a client, nor would he predict what the jury's verdict would be. Counsel stated he routinely advises a defendant that the decision to testify is ultimately his to make and he would never make a unilateral decision to rest the case without discussing with his client whether or not he wanted to testify. If a defendant wanted to testify, counsel stated he would not hinder him from doing so, and if a defendant changed his mind after resting the case, counsel would bring it to the court's attention that the defendant now wants to testify.

> The Court finds counsel's testimony that he would not have advised [Petitioner]: (a) the jury would learn the nature of his conviction should he testify; and (b) this case was "in the bag," more credible than

> [Petitioner's] allegations and testimony to the contrary.
> See Bussell, 66 So. 3d at 1062; Thomas, 838 So. 2d at
> 540-41. Further, although counsel could not recall the
> precise details of his conversations with [Petitioner] on
> these topics, the Court considers the inference created
> by counsel's testimony of his routine practice
> persuasive. See Avila, 43 So. 3d at 938.

Ex. 16 at 7-8 (internal record citations omitted). Petitioner appealed the denial of his Rule 3.850 motion, and the First DCA per curiam affirmed without a written opinion. Ex. 24.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Three is denied.

**D. Ground Four**

In his final ground for relief, Petitioner argues the trial court erred in denying his motion to suppress out-of-court and in-court identifications of him by the victims. Doc. 4 at 10. Respondents argue Petitioner does not allege the violation of a Constitutional right and, therefore, the claim is not cognizable, but regardless, the claim is not exhausted because Petitioner did not alert the state court to the federal nature of his claim on direct appeal. Doc. 16 at 43-44.

17

Alternatively, Respondents argue the claim must be denied because it lacks merit. Id. at 46. Petitioner does not address this ground in his Reply. See generally Doc. 19.

Liberally construing Petitioner's pro se allegations, he argues he was denied due process when the trial court denied his motion to suppress because the victims' identifications of him resulted from "impermissibly suggestive procedures." See Doc. 4 at 10. Accordingly, the Court finds the claim cognizable.

The Court also finds Petitioner "fairly presented" to the state court the same federal claim he raises in his Amended Petition, thus exhausting the claim. See McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005). In his brief on direct appeal, prepared by appellate counsel, Petitioner argued "[t]he trial court erred in denying [his] motion to suppress" and set forth the relevant, binding legal standard as set forth by the Supreme Court. Ex. 9 at 18, 20-21 (quoting Stovall v. Denno, 388 U.S. 293, 301-02 (1967); Neil v. Biggers, 409 U.S. 188, 198 (1972)). Cf. McNair, 416 F.3d 1291, 1302-03 (holding the petitioner did not fairly present his federal claim to the state court where he specifically stated the claim was based on state law, and only vaguely referenced federal law twice, once by citing a federal district court order in a string citation, and once by mentioning various Constitutional amendments in a closing paragraph). Additionally, upon review of its answer brief, it is apparent the State understood Petitioner was raising a federal claim. See Ex. 10 at 3, 16-17, 19,

18

24-26. Finding Petitioner exhausted this claim, the Court will address the merits.

An out-of-court identification is subject to exclusion if the identification procedure was unduly suggestive so that it created a substantial risk of misidentification. Biggers, 409 U.S. at 198-99 ("It is the likelihood of misidentification which violates a defendant's right to due process."). In determining whether an identification violates due process, a court undertakes a two-part analysis. "First, [the court] must determine whether the original identification procedure was unduly suggestive," and if so, the court must "consider whether, under the totality of the circumstances, the identification was nonetheless reliable." Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988) (citing Biggers, 409 U.S. at 199).

The Supreme Court has identified five factors courts are to consider in determining whether a witness's identification was reliable: the witness's opportunity to view the suspect during the crime; the witness's degree of attention; the accuracy of the witness's description of the suspect; the level of certainty of the identification; and the length of time between the crime and the identification. See Biggers, 409 U.S. at 199-200. Absent "a very substantial likelihood of irreparable misidentification," the identification of a suspect by a witness is evidence for the jury to weigh. Manson v. Brathwaite, 432 U.S. 98, 116 (1977).

Petitioner was charged with robbing a couple who, at the time, were picking out a movie at a Red Box machine located in a "well lit" area outside a Walgreens. Ex. 2; Ex. 6 at 92, 97-98, 125. Before trial, Petitioner sought to suppress the out-of-court photo identification of him by the female victim, arguing four of the six men bore little resemblance to him and two of the six were "dark skinned African Americans," even though the victims reported the suspect as being of "Hispanic origin." Ex. 4 at 1. Petitioner also sought to prohibit both victims from being asked to make an in-court identification because there "exist[ed] no independent basis in the mind of the [victims] for in-court identification other than the photo spread." Id. at 2.

The trial court conducted an evidentiary hearing on the motion to suppress at which the detective who prepared and conducted the photospread testified. Ex. 6 at 40-41. The detective relayed that the victims reported the suspect was "a light-skinned black male with Hispanic features," and he had received a "tip from an officer in the neighborhood" that Petitioner may have been the suspect. Id. at 42. Based on that information, the detective used a specialized computer program in which he input relevant criteria and obtained "a vast majority of individuals that [met] that criteria." Id. at 43. In accordance with procedure, the detective presented the resulting proposed photospread to his supervisor, but the supervisor did not approve it. Id. at 43-44. The second proposed photospread was rejected as well. Id. at 44. The third proposed

photospread was approved, and the detective met with the victims on June 7, 2010, two days after the robbery. Id.

Planning to meet first with the male victim, the detective went to his place of employment, but the female victim happened to be there as well, so the detective read them both the instructions for the process and showed them both—separately—the same six photos. Id. at 45-48. The male victim viewed the photos first. Id. at 46-47. He was unable to positively identify the suspect, but he narrowed the photos to two, one of which was of Petitioner. Id. at 47-48. Viewing the photos outside the presence of her boyfriend, the female victim "immediately identified" Petitioner as the suspect, becoming "physically bothered [when she saw] the photograph." Id. at 48, 56.

On the record and after hearing testimony, the trial court denied Petitioner's motion to suppress, finding the "procedure employed by the police was not unnecessarily suggestive" or "improper." Id. at 58, 60, 62. The judge explained, "[A]ll of the individuals [in the photos] are relatively close in appearance. Of course, [Petitioner] is, apparently, African American, but very light skinned, . . . and the other African Americans depicted in the photospread are light skinned." Id. at 58. Given the suspect was described as being either African American or Hispanic, the judge noted, "I think the police used . . . the only procedure that they could have, given the circumstances." Id. at 59.

The judge disagreed with trial counsel's characterization that Petitioner was the only light-skinned African American included in the photospread with the other two being "really dark," and that "[t]he other three . . . [were] clearly Hispanic," observing as follows:

> I don't think that that is necessarily the case. . . . [T]here is, admittedly, one darker skinned African American, but not dark dark. The others are in my opinion light skinned and then, of course, the Hispanics. I mean I don't know that you can do anything else other than put a mixture of African American and Hispanic.

Id. Trial counsel asked the court to reconsider its ruling with respect to the male victim's future in-court identification because the male victim could not identify Petitioner through the photospread and lived with the female victim who was confident about her photo identification of Petitioner, and because Petitioner would be the only African American male sitting at the defense table. Id. at 60-61. The court reiterated that the police procedure was not impermissibly suggestive, and advised counsel that if the male victim were to identify Petitioner in court—a fact as yet unknown—counsel could point out any perceived unreliability of the identification on cross-examination. Id. at 61-62.

The briefs on direct appeal summarize the relevant facts and arguments. See Ex. 9 at 5-7, 9-11; Ex. 10 at 5-11. Petitioner argued the trial court erred in denying his motion to suppress and permitting the out-of-court photo identification of him by the female victim and "the resulting in-court

identifications [by both victims] at trial." Ex. 9 at 18. The State argued the photospread was not "impermissibly suggestive" for the reasons stated by the trial court and further noted the lack of suggestiveness was evident in the fact that the male victim was unable to positively identify the suspect from the same six photos the female victim viewed. Ex. 10 at 18. As to the female victim's out-of-court photo identification of Petitioner, the State analyzed the Biggers factors in light of her trial testimony:

> Assuming, arguendo, that the procedures employed by Detective Royal were impermissibly suggestive, the suggestive procedure did not give rise to a substantial likelihood of irreparable misidentification." Dorsey, 5 So. 3d at 705; See Manson, 432 U.S. at 110-114; See also, Rimmer, 825 So. 2d at 316; Edwards, 538 So. 2d at 442. Considering the factors set out to determine the likelihood for misidentification, it is clear that the out-of-court identification made by [the female victim] was not admitted in error. [The female victim] testified that she had an opportunity to view [Petitioner] at the time of the crime because she froze and looked at [Petitioner's] face for a couple of minutes. See Johnson, 717 So. 2d at 1063; Edwards, 538 So. 2d at 442. The witness also testified that the area was very well lit. The degree of attention that the witness paid to the [Petitioner's] face was grave because she was focused on him for a couple of minutes. See Johnson, 717 So. 2d at 1063; Edwards, 538 So. 2d at 442. The witness testified that she told the officer the night of the incident that the suspect was somewhere between 5'10" to 6'1", mid-twenties to early thirties, and that he was either Hispanic or African American. See Johnson, 717 So. 2d at 1063; Edwards, 538 So. 2d at 442. [Petitioner] is a 6'1", African American male that weighs 185 pounds. The witness [sic] level of certainty upon seeing [Petitioner's] photo

in the photospread was completely certain. <u>See</u> <u>Johnson</u>, 717 So. 2d at 1063; <u>Edwards</u>, 538 So. 2d at 442. In fact, the witness became physically upset upon seeing the photo. Finally, the length of time between the robbery and the identification was only two days. <u>See</u> <u>Johnson</u>, 717 So. 2d at 1063; <u>Edwards</u>, 538 So. 2d at 442. Because, "[a]n identification obtained from suggestive procedures may be admitted if the court finds it reliable apart from the tainted procedures," [the victim's] identification of [Petitioner] must be admitted. Based on the factors set out, it is clear that the identification was reliable. <u>See</u> <u>Johnson</u>, 717 So. 2d at 1063; <u>Edwards</u>, 538 So. 2d at 442.

<u>Id.</u> at 18-20. The First DCA found no error in the trial court's ruling and per curiam affirmed Petitioner's judgment and conviction without a written opinion. Ex. 11.

In accordance with the deferential standard for federal court review of state court adjudications, and upon a thorough review of the record, the Court finds the state court's ruling on this claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Four is denied.

Accordingly, it is

**ORDERED**:

1.   The Amended Petition (Doc. 4) is **DENIED**, and this case is **DISMISSED with prejudice**.

24

2.      If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[7]

3.      The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 1st day of August, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-6

c:
Lamar Tyree Monroe
Counsel of Record

---

[7] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.